IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **LEANNE PATT,** | § | |
| *Plaintiff,* | § § § | |
| v. | § § | |
| **PSN AFFILIATES, LLC D/B/A LEGENT ORTHOPEDIC HOSPITAL,** | § § § § | CIVIL ACTION NO. _____ |
| *Defendant.* | § | **JURY TRIAL DEMANDED** |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff Leanne Patt (hereafter referred to as "Plaintiff" or "Patt"), by counsel and brings this action for violations of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.,* for gender and pregnancy discrimination and retaliation and the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k), complaining of Defendant Legent Orthopedic Hospital (hereafter referred to as "Defendant" or "Legent") and respectfully shows the Court as follows:

I.

## PARTIES

1.01.   Leanne Patt is an individual, who is a citizen and resident of the State of Texas, who may be contacted through her undersigned counsel of record.

1.02.   Defendant PSN Affiliates, LLC d/b/a Legent Orthopedic Hospital is a Texas domestic limited liability company with its principal place of business located at 1707 Market Place, Suite 300, Irving, Texas 75063.  Plaintiff worked at Defendant's facility Legent Orthpedic Hospital located at 1401 E. Trinity Mills Road, Carrollton, Texas 75006.  Defendant's agent for service of process in the State of Texas is Cogency Global, Inc., 1601 Elm Street, Suite 4360, Austin, Texas 75201.

## I.

## JURISDICTION AND VENUE

2.01.   Jurisdiction is conferred on this Court by 28 U.S.C. § 1331.

2.02.   Venue for all causes of action stated herein lies in the Northern District of Texas because the Defendant resides in this District and because a substantial part of the events alleged in this Complaint took place within this District.  *See* 28 U.S.C. § 1391(b).  Plaintiff's EEOC charge was filed and pursued in the Dallas District office of the EEOC.  Plaintiff received her Notice of Right to Sue and has timely filed this lawsuit.

## III.

## FACTUAL ALLEGATIONS

3.01.   Plaintiff started with Texas Health Hospital in March of 2018.  The company was owned by Adeptus but had a joint venture with Texas Health Resources.  When Plaintiff first started with this company, it was a great, really supportive work environment.

3.02   A few months into Plaintiff's employment Defendant lost its Joint Venture with

Texas Health Resources and its freestanding emergency rooms were bought out by a separate company, so Texas Health Hospital then separated from Texas Health Resources. Therefore, Defendant ended up changing its name back to their original name which was "First Texas Hospital." After the change things were still great.

3.02   A few more months later Adeptus ended up failing and planning to file bankruptcy. Adeptus met with potential buyers who would not only take over the hospital but also the company's debt. Adeptus began taking several potential buyers around the hospital for tours. PSN affiliates became frequent visitors around the hospital, they showed very strong interest in buying Adeptus' facility.

3.03   After a few visits and tours, PSN Affiliates d/b/a Doctors Hospital decided to buy the Adeptus hospital. This process took several months. With this change, Plaintiff and the other employees were given the opportunity to either move and go with the old failing company (Adeptus) which still had a joint ownership with the freestanding emergency rooms that were now owned by "Doctors Hospital," or the employees could take the opportunity to interview to keep their current positions at the new company (PSN Affiliates).

3.04   During that grace period of waiting for PSN Affiliates to take entire ownership, Plaintiff's manager David Rodriguez ("David") was given the opportunity to transfer and leave his position with Adeptus and go to PSN Affiliates a few months prior to the official switch. While all employees were still currently employed with Adeptus and waiting to switch, David Rodriguez had already left and started his new position at PSN Affiliates, therefore he could prep for all the new changes, while also learning the new systems and protocols for PSN Affiliates.

3.05   After David had left, Plaintiff and David began texting or talking on the phone outside of work hours. He then made a point of telling Plaintiff that during this time period, he was technically not Plaintiff's Boss. David had confided in Plaintiff some personal things about how there was no sexual relationship between himself and his wife.

3.06   David began offering Plaintiff "Incentives" if Plaintiff were to sleep with him. Plaintiff soon became a sexual fantasy of his. He would send money or make promises that Plaintiff would be promoted in her position and get a raise. He explained to Plaintiff that this wasn't his first time. He had slept with younger girls at previous places of employment. He even expressed how he fell in love with a previous employee at Defendant. He told Plaintiff stories about them going out after work and drinking and how he doesn't fully remember what had happened between them, but he had wished he had done more.

3.07   PSN Affiliates officially took over ownership and several employees on August 2019.  A lot of other employees were made promises of employment and kind of screwed over. At this point Plaintiff was having a sexual relationship with her manager David Rodriguez, while also having a sexual-personal relationship with another new employee that came over with PSN. In January of 2020 Plaintiff found out that she was pregnant. At that time, Plaintiff wasn't entirely sure who the biological father was. Both men knew about each other the entire time. Both were comfortable splitting the cost of the paternity test.

3.08   Once Plaintiff's manager, David, found out that Plaintiff was pregnant, he immediately wanted to tell his wife and end things between them. He seemed like he was looking for an out of his marriage and this was the chance.  Plaintiff explained to him, let's wait until they

know the final results. He was reluctant but agreed.

3.09    During the waiting period of the test results, David began to get a bit messy and kind of speak on things to other employees and other employees started to notice the relationship between Plaintiff and David, as things were getting more apparent. During this time, David was also trying to get another employee, their Lead, to start a sexual relationship with him. She was not interested and was pretty upfront with him about it, as she was married. He still persisted with her. He would make comments like "Oh, I can get Leanne to do anything for me" or "That's why she calls me Daddy." This employee soon ended up resigning from her position. She stated it was for better opportunities, but she had been there since that company had opened and through all the changes. Plaintiff believed she was made so uncomfortable that she left due to sexual harassment.

3.10    After the DNA test results came in to determine who the biological father was, basically the entire patient access department knew everything. They knew Plaintiff was pregnant and who the potential fathers were. Once the results came in Plaintiff found out that her manager David was not the father.  That's when things started getting weird and changing rapidly. David completely changed towards Plaintiff.  Plaintiff started getting emails about little things. Plaintiff was getting in trouble for anything and everything.

3.11    Plaintiff started getting noticed more by higher management, and not in a good way. At this point, it seemed like all eyes were on Plaintiff. Plaintiff became very uncomfortable in the workplace. It seemed like their intent was to make Plaintiff more uncomfortable and make things harder for Plaintiff in her workplace. Plaintiff was also expected and asked to work excessive and crazy hours while pregnant. It seemed like the end goal was to get to the point of where Plaintiff

would quit on her own.

3.12    Once covid spiked, Plaintiff was moved to a different location so she would be out of the emergency room. Plaintiff thought this was nice and that management cared. Human resources began visiting with Plaintiff frequently about her benefits, Plaintiff's leave and everything pertaining to her leave. They constantly reminded Plaintiff that she did not qualify for paid leave.

3.13    The work hours at another location were conflicting with Plaintiff's other job and Defendant knew this. Defendant eventually ended up moving Plaintiff back to the Carrollton location, as there were new protocols in place.

3.14    Once Plaintiff returned to the Carrollton location, Plaintiff was confronted by the Director of patient access about if Plaintiff would like to change her position, take a new schedule or want to move to a new location. She made it out as she wanted to accommodate Plaintiff's every want and need, once Plaintiff was a new mother. But this also seemed like they just wanted Plaintiff out of that location. Plaintiff explained to her that Plaintiff would like to keep her current position and current schedule upon returning from maternity leave.

3.15    This is when the picking on Plaintiff by management got really excessive. Defendant's employees were always allowed to get snacks by the kitchen from the old company. PSN let the employees know that their company did not allow that.  Employees had received an email about it. Many of the employees were unaware, as the employees were always allowed to do so by the previous employer. The employees all stopped getting snacks. But the employees still had to go get things for patients as needed.  Plaintiff had her own snack cabinet since she had

worked for Defendant.  Defendant told Plaintiff to get rid of all her snacks as it was a safety issue.  Plaintiff did indeed remove everything.   Plaintiff ended up just stocking up on her favorite snacks in the breakroom fridge and some lockers, as she wanted to follow Defendant's rules and not risk her job. As soon as Plaintiff did so is when she got in trouble.

3.16   The day before termination, Plaintiff was running late due to an ultrasound appointment.  Everyone understood that Plaintiff had prenatal appointments and that this could happen.  David was very understanding. He had texted Plaintiff asking how long she would be.  Plaintiff told him she was close and to let the person who was covering the shift before her know that they could go ahead and leave since he was still there.  Once Plaintiff arrived David was very dry and asked Plaintiff if she could stay late in the morning.  Plaintiff agreed as always.

3.17   Early that morning, Plaintiff had noticed HR was there really early, around 6am.  Plaintiff also noticed that they had called in a new employee.   Plaintiff noticed that the employee was receiving papers from HR as Plaintiff was walking up the hallway with her breakfast.

3.18   Soon after Plaintiff began eating her breakfast, Plaintiff had noticed David coming in earlier than usual and he walked straight into the board room with HR. It immediately clicked "I'm about to get fired."  As soon as it clicked, sure enough David walked in and asked Plaintiff to go with him.   Plaintiff was sat down by HR, David and the nursing manager and explained Plaintiff was getting terminated for stealing.  Plaintiff refused to sign anything or agree to anything.

3.19   In the termination letter Defendant gave an exact date of when Plaintiff was "stealing."   As Plaintiff was close to the security department, they pulled up video footage from that date and you can clearly see that Plaintiff was grabbing supplies (such as condiments, plates,

silverware etc.) to take to the breakroom next door. That breakroom is also where Plaintiff had her snacks and lunch stored.  There was no theft of its property as charged.

3.20     Plaintiff believes she was not only fired because Defendant did not want to pay her medical benefits during her pregnancy.

## IV.

### FIRST COUNT

### GENDER AND PREGNANCY DISCRIMINATION AND RETALIATION

4.01.    The foregoing paragraphs of this Complaint are incorporated in this Count as fully as if set forth at length herein.

4.02.    Plaintiff was an employee within the meaning of Title VII and belongs to a class protected under the statute, namely she is female.  42 U.S.C. §2000e(f) and (k).

4.03.    Defendant is an employer within the meaning of Title VII. 42 U.S.C. §2000e(b).  In particular, Defendant employs more than fifteen (15) employees within the current calendar year.

4.04.    Defendant intentionally discriminated against Plaintiff because of her gender in violation of Title VII by discriminating against her on the basis of pregnancy, childbirth, or related medical conditions. 42 U.S.C. §2000e(k). Furthermore, Defendant retaliated against Plaintiff by terminating Plaintiff and firing her.

4.05.    Plaintiff was terminated without good reason.  Furthermore, Defendant was aware that Plaintiff was pregnant and needed accommodations.  Plaintiff never complained to HR because

it was well known that if you complained to HR then an employee would be retaliated against. Defendant denied Plaintiff's request for accommodations and placed her at risk. Plaintiff did go to HR to discuss parental options.

4.06.   All conditions precedent to filing this action for discrimination under federal law have been met. Plaintiff timely filed her charge of discrimination and has received her Notice of Right to Sue within 90 days of filing this original action. (*See* **Exhibit A**).

4.07.   Defendant violated Title VII by discharging Plaintiff and/or discriminating against Plaintiff with compensation, terms, conditions or privileges of employment because of Plaintiff's sex. Discrimination was a motivating factor in Defendant's actions toward Plaintiff. Defendant retaliated against Plaintiff by firing her after she complained of discrimination, harassment and failure to accommodate.

4.08.   As a direct and proximate result of Defendant's conduct, Plaintiff has suffered significant financial loss, including the loss of her job and the loss of wages, salary and employment benefits.

4.09.   Such discrimination and retaliation by Defendant against Plaintiff was intentional. Accordingly, Plaintiff is entitled to recover damages from Defendant for back pay, front pay, past and future pecuniary losses, emotional pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Further, this discrimination was done with malice or with reckless indifference to Plaintiff's federally protected rights. Plaintiff is therefore entitled to recover punitive damages.

4.10. Plaintiff is entitled to an award of attorneys' fees and costs under Title VII as well as reimbursement of expert witness fees.

## V.

## SECOND COUNT

### DISCRIMINATION BECAUSE OF SEX IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000(E) ET SEQ AND CHAPTER 21 OF THE TEXAS LABOR CODE

5.01 The foregoing paragraphs of this Complaint are incorporated in this count as fully as if set forth at length herein.

5.02 Plaintiff is an employee within the meaning of 42 U.S.C. § 2000e(f) Title VII and belongs to a class protected under the statute, namely females.

5.03 Defendant is an employer within the meaning of 42 U.S.C. § 2000e(d) Title VII since it employs more than fifteen employees.

5.04 Defendant is also an employer within the meaning of Chapter 21 of the Texas Labor Code

5.05 Defendant intentionally discriminated against Plaintiff because of her sex in violation of Title VII and Chapter 21 of the Texas Labor Code.  by creating a work environment hostile to women.

## VI.

## THIRD COUNT

## UNLAWFUL RETALIATION IN VIOLATION OF 42 U.S.C. § 2000(E) ET SEQ and CHAPTER 21 OF THE TEXAS LABOR CODE.

6.01 The foregoing paragraphs of this Complaint are incorporated in this count as fully as if set forth at length herein.

6.02 Pursuant to 42 USC section 2000(E) *et seq*., an employer commits an unlawful employment practice if the employer retaliates or discriminates against a person who opposes a discriminatory practice; makes or files a charge; files a complaint; or testifies, assists, or participates in any manner in an investigation, proceeding, or hearing.

6.03 The same provision is found in Chapter 21.055 of the Texas Labor Code.

6.04 Defendant retaliated against Plaintiff after she ended the sexual affair with her manager David Rodriguez who created a sexually hostile environment in the workplace by terminating Plaintiff's employment.

6.05 Defendant terminated Plaintiff's employment on August 3, 2020. Defendant's stated reason for Plaintiff's termination was that Plaintiff was stealing food and kitchen supplies. This stated reason is a pretext for retaliation because Plaintiff had committed no wrongdoing, as she brought her own snacks to work and kept them in the kitchen. Also, other employees who had engaged in similar conduct were never disciplined or terminated.

6.06. Defendant knowingly and willfully retaliated against Plaintiff for her protected activity in violation of Title VII.

6.07    Defendant's conduct was malicious and/or taken with reckless disregard for Plaintiff's rights.  It was foreseeable by Defendant that Plaintiff would suffer harm as a result of the retaliation and discrimination.

## VII.

## JURY DEMAND

7.01.    PLAINTIFF DEMANDS A TRIAL BY JURY.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, Plaintiff have and recover the following relief against Defendant:

1. Judgment for back pay and front pay and all past and future lost fringe benefits;

2. Judgment for actual damages in the amount of past and future lost earnings and benefits, and damages to past and future earnings capacity;

3. Compensatory damages for the humiliation, damage to reputation, mental and emotional distress, and pain and suffering Plaintiff has experienced and endured as a result of the discriminatory actions of Defendant;

4. The costs and expenses incurred by Plaintiff in seeking new employment;

5. Damages for past and future mental anguish and emotional distress and damages to reputation;

6. Economic and reliance damages,

7. Prejudgment and postjudgment interest at the maximum legal rate;

8. Attorneys' fees;

9. Expert's fees;

10. All costs of court; and

11. Such other and further relief to which Plaintiff may be justly entitled.

Dated: August 13, 2021

          Respectfully submitted,

          **KILGORE & KILGORE, PLLC**

    By  *W. D. Masterson*
          W. D. Masterson
          Texas State Bar No. 13184000
          wdm@kilgorelaw.com
          3109 Carlisle Street
          Dallas, TX  75204
          214-969-9099 - Telephone
          214-953-0133 – Fax

          **ATTORNEYS FOR PLAINTIFF
LEANNE PATT**